Deron A. Kartoon  (State Bar No. 155925)
Law Offices of Deron A. Kartoon
3 Sir Francis Drake Boulevard
P.O. Box 1403
Ross, CA 94957
Telephone: (415) 786-7737
Fax: (415) 755-4672
Email: deron.kartoon@gmail.com
        Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
NOTRTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| Thomas ("Leroy") A. Spitzer, and Craig J. Spitzer,<br><br>                              Plaintiffs<br><br><br><br>                     vs.<br><br><br><br>Trisha A. Aljoe, Jonathan P. Lowell, George Thomas, Walter Wickboldt, City of Pleasanton, City of Pleasanton Police Officers Sgt. Robert Leong and Ryan Tujague, and Does 1-10, inclusive,<br>                              Defendants | Docket No. 13-cv-05442 MEJ<br><br><br>THIRD AMENDED COMPLAINT FOR DAMAGES FOR VIOLATION OF CONSTITUTIONAL AND STATE STATUTORY RIGHTS;<br><br>DEMAND FOR JURY TRIAL |

## JURISDICTION

1. This is a civil action to redress the deprivations under color of statute, ordinance, regulations, custom or usage of rights, privileges, and immunities secured to plaintiffs by the 14th Amendment to the Constitution of the United States, namely their rights under the 1st, 4th and 14th Amendments of the United States Constitution. This court has subject matter jurisdiction under 42 USC § 1983, and 28 USC §§ 1331 and 1343(a)(3).

2. Plaintiffs further invoke the jurisdiction of this court under 28 USC § 1367(a) to hear and decide claims arising out of the Constitution and laws of the State of California and the City of Pleasanton. Plaintiffs filed a timely claim with the City of Pleasanton pursuant to the California Government Claims Act on Feb 19, 2013.  The City of Pleasanton did not serve notice of rejection, thereby extending the time to file a claim in a court of law from 6 months from the date of rejection to 2 years from accrual of the action.  The Complaint was, therefore, timely under the California Government Claims Act.

### INTRADISTRICT ASSIGNMENT

3. The case has been assigned to the San Francisco Division.

### PARTIES

**Plaintiffs**

4. Plaintiff Thomas ("Leroy") A. Spitzer and plaintiff Craig J. Spitzer (jointly "the Spitzers") are citizens of the United States by birth, and at all times relevant to the complaint were citizens of the State of California residing in Alameda, or San Mateo and San Francisco Counties respectively.

5. The Spitzers are co-owners of the subject single family residence located at 4719 Orangewood Court ("house") in the City of Pleasanton, California. The house has never been rented and never had tenants.

6. Plaintiff Craig J. Spitzer ("Craig") is the son of Leroy. Craig inherited his interest in the house from his mother, Leroy's wife, who died under the care of her family at the Spitzers' house. Craig did not reside in the house at any time relevant to the subject matter of this complaint, and only a few things stored at the house were his personal property.

7. Plaintiff Leroy is 73 years old, is the original owner of the house, and resided in it continuously from the time he and his wife first purchased it 46 years ago**.**  Leroy is a certified welder with multiple certifications, he has multiple skills and much knowledge in the mechanical arts.  He has always had, stored, and used at his house the parts, supplies, and tools necessary for the exercise of his skills.

**Defendants**

8.  Defendant City of Pleasanton is a municipal corporation of the State of California.

9.  At all times relevant to the complaint, defendant Trisha A. Aljoe ("Aljoe") was an agent of the City of Pleasanton, employed by contract as an independent contractor and acting as an abatement consultant, legal advisor, and Special Counsel for the City on code enforcement and building code matters. Defendant Aljoe is sued in both her personal and official capacities.

10. At all times relevant to the complaint, Defendant Jonathan P. Lowell ("Lowell") was an agent and employee of the City of Pleasanton with the title and duties of City Attorney.  As City Attorney, Lowell has policy-making authority on matters of nuisance abatement. Defendant Lowell is sued in both his personal and official capacities.

11. At all times relevant to the complaint, defendant George Thomas ("G. Thomas") was an agent and employee of the City of Pleasanton with the title and duties of Chief Building and Safety Official. Thomas has the authority under the Pleasanton Dangerous Building Code to issue a "Notice and Order." Defendant G. Thomas is sued in both his personal and official capacities.

12. At all times relevant to the complaint, defendant Walter Wickboldt ("Wickboldt") was an agent and employee of the City of Pleasanton with the title and duties of Senior Code Enforcement Officer. Under Pleasanton City policy, Wickboldt "serves as a resource to Police Officers in addressing neighborhood problems." Defendant Wickboldt is sued in both his personal and official capacities.

13. At all times relevant to the complaint, City of Pleasanton police officers, Sgt. Robert Leong # unknown, and Ryan Tujague # 245, were agents and employees of the City of Pleasanton Police Department.  Defendant police officers are sued in both their personal and official capacities.

14. At all times relevant to the complaint, defendant Does 1-10 were agents and/or employees of the City of Pleasanton, and/or co-conspirators with City agents and employees and/or J.Benjamin McGrew. The true names of these Doe defendants are unknown to the plaintiffs because their identities can only be determined through discovery. Defendant Does 1-

10 are sued in both their personal and official capacities if they are officials.

**CLAIMS FOR RELIEF**

**I. PRELIMINARY STATEMENT OF THE CLAIMS**

15. The following claims involve defendants' misconduct while seeking abatement of alleged State Housing Law violations at plaintiffs' house. Defendants maliciously, intentionally, and in bad faith pursued abatement by unlawful means, and did so pursuant to a series of unlawful acts pursuant to an overall unlawful conspiracy to unreasonably seize and deprive plaintiffs of their house and personal property without due process of law. Defendants' series of unlawful acts violated the plaintiffs' Constitutional and state statutory rights, and caused significant damages to them.

16. Defendants' overall conspiracy was the result of the defendant City's and City Attorney's policy of maliciously and intentionally applying the California State Housing Law in an unconstitutional manner. This policy is to improperly and unlawfully seize high value residential property subject to abatement in order to convert it into unreasonable and unnecessary, and costly receiver's and attorney's fees to profit from, and pay the costs of a receivership action. Defendants' policy is implemented by maliciously and intentionally choosing unnecessary receivership actions for which there are more reasonable and equitable alternatives, and depriving owner/residents of a reasonable opportunity to correct the violations or vacate their personal property by unreasonably barring them from entering their house. The policy is completed by forcing sale of the real property to pay the unnecessary, and oppressively high costs of receivership, attorney fees, and costs, and dispossessing its resident-owner by its sale without the due process of law.

17. Defendants City and City Attorney, acting in their policy-making capacity, adopted and carried out this policy pursuant to the direction and participation of private counsel defendant Trisha A. Aljoe ("Aljoe").  Aljoe was hired and acted in an improper dual and conflicting role of abatement consultant and advisor, and special counsel. This is an improper mixing of advisory and prosecutorial duties. Defendant Aljoe acted beyond the scope of

prosecutorial functions and duties by usurping the discretionary and independent decision-making authority and duties of City employees, agents, and entities by giving them directions and orders, and enlisting them in her unlawful schemes.  She also gave orders to and made threats to the appointed receiver to gain his cooperation in her unlawful schemes, and threatened plaintiffs and their helpers friends with arrest both directly and indirectly while they were working to correct the violations, with the express purpose of preventing them from doing so.

18.  The conduct and acts of the individual defendants stated in the following claims are further the result of a policy, custom, or practice of defendant City of Pleasanton, and defendant City Attorney, acting in both his policy-making and supervisory role, of tolerating, approving, and ratifying known constitutional violations; failing to take disciplinary action to rectify and prevent known abuses; and deliberate indifference to the repeated commission of known constitutional violations.

## II. STATEMENT OF FACTS AND CIRCUMSTANCES GIVING RISE TO CLAIMS 1 - 3

19.  Plaintiffs incorporate herein by reference each and every allegation in the foregoing ¶¶ 1-18, and in the following ¶¶ 30-160, as though fully set forth herein.

20. On August 23, 2011 the defendant City of Pleasanton ("City") and City Attorney Jonathan P. Lowell ("Lowell"), entered into a "Professional Services Agreement" with defendant Trisha A. Aljoe ("Aljoe") to provide "Consultant Services" to assist the City Attorney's Office in Code enforcement and building code matters, as well as to litigate matters as Special Counsel for the City. After having  Aljoe visit the property, Lowell and Aljoe "began discussing the  best legal course of action to abate this particular property."

21. Aljoe and Lowell agreed to file a petition to appoint a receiver. Aljoe ordered multiple inspections of plaintiffs' house to be made pursuant to this agreement.  Based on these inspections, Aljoe prepared and filed an application for an inspection warrant on Oct. 11 2011. The Application was granted, and the inspection was executed on Oct. 21, 2011, by defendant City staff including, but not limited to defendant Walter Wickboldt ("Wickboldt"), defendant George Thomas ("G. Thomas"), and Aljoe. Three Pleasanton police officers were also present

at the inspection.

22. On Oct 24, 2011, Pleasanton police officer Sergio Martinez #267 ("Martinez"), created a parking incident report at plaintiff Thomas ("Leroy") Spitzer's house at 4719 Orangewood Ct., a cul de sac in the City of Pleasanton. Leroy was residing there when this incident occurred.

23. Three days later on Oct. 27, 2011, Marinez returned and cited Leroy's Red Mazda pickup truck ("Mazda"), for alleged violation of PMC 11.40.020 (72 hr. parking) while it was parked in front of Leroy's house where he normally parked it. The "Detail Call for Service Report" for this incident states "certified abatement letter to be mailed." No such letter was ever mailed.

24. On Nov. 7, 2011, Martinez ordered Leroy's Mazda towed for alleged violation of California Vehicle Code ("CVC") § 22669(b)(Removal of abandoned vehicles). Leroy's Mazda was not a hazard to traffic or public safety or a target of vandalism or theft. It was registered, operable, and regularly driven by Leroy.  On the Vehicle Report form Martinez filled out checked the "Release Vehicle to RO [registered owner] or agent" box.  At the time he towed it, Martinez knew that Leroy's Mazda was not abandoned.

25.  At a later meeting at Leroy's house attended by Aljoe, Leroy overheard Aljoe say to Wickboldt, "I thought we got rid of those vehicles."  "Those vehicles" she referred to were two antique vehicles parked in Leroy's driveway that had been the subjects of an abatement letter served to Leroy and an abatement proceeding which occurred after the foregoing described Oct. 21, 2011 inspection. Leroy overheard Wickboldt explain to Aljoe that the abatement hearing officer decided in favor of Leroy and against her and the City.

26.  On Nov. 7, 2011, the day his Mazda was towed, Leroy went to the City of Pleasanton Police Department ("Police Department") to pay the normally required fees in order to get the normally given release for towed vehicles required by law, which Leroy was required to have before he could pick up his Mazda from the storage yard where it had been taken and stored.

27.  Leroy was told by Police Department staff that his Mazda could not be released, and

to come back later to talk to defendant police officer Sgt. Robert Leong ("Leong"), aka "Lt. Leon," who was not then available. Leroy came back to the Police Department, and called the Police Department multiple times over a period of over one week, asking for "Lt. Leon," but he was always either not in or was unavailable.

28.  When defendant Sgt. Leong was finally available at the Police Department, he came out to the front desk area, where Leroy was waiting, with a file in one hand and a paper in his other hand. He said he wouldn't release Leroy's Mazda because it had been "abated," and waved the paper saying "we sent you a letter," as if it was the letter he spoke of, and the authority for his statement. He did not show the alleged letter to Leroy.

29. The alleged letter was never sent to Leroy. No hearing was ever held, and no administrative judgment or order of abatement was ever issued on Leroy's Mazda truck.  At the time he refused to release Leroy's vehicle, Sgt. Leong knew these facts were true. As a consequence of his inability y to obtain release of his Mazda truck from Sgt. Leong, Leroy lost possession of it permanently on Dec. 15, 2011, by its sale by the company that had towed and stored it.

## CLAIM 1
### Unreasonable Seizure of Leroy's Vehicle
Plaintiff  Leroy v. Defendants Aljoe, Lowell, G. Thomas, Wickboldt, Does 1-10, City of Pleasanton ("Defendants")

30. Leroy's Mazda truck was unlawfully seized by Pleasanton police officer Sergio Martinez on Nov. 7, 2011. Its unreasonable and unlawful seizure was set in motion by the agreement and meeting of the minds of Defendants Aljoe, Lowell, G. Thomas, Wickboldt, and Does 1-10 at and before and after the Oct. 21, 2011 inspection of plaintiffs' house. Defendants jointly and severally acted, participated in, or directed its unlawful seizure pursuant to its unlawful abatement.

31. Defendants' seizure of Leroy's Mazda truck was unreasonable and unlawful, in violation of the 4th Amendment of the United States Constitution, for the following reasons: (a) lt was not abandoned. It was registered, operable, and regularly driven by Leroy. (b) It was not a hazard to traffic or public safety, or a target of vandalism or theft. (c) It was not released to

Leroy by defendant Sgt. Robert Leong ("Leong") upon Leroy's offer to pay the fees in violation of CVC § 22850.3, which required its release. (d) Leroy lost possession of his Mazda permanently on Dec. 15, 2011, without due process of law, because of its sale by the company that had towed and stored it. (e) Defendants' seizure of Leroy's Mazda was an intentional violation of plaintiffs' constitutional rights, and was malicious, in bad faith, and pursuant to Defendants' agreed to improper purpose of permanently and unlawfully depriving plaintiffs of their house and personal property without due process of law. (f) This was the 1st act of a series of unlawful acts, pursuant to custom, policy and practice of the City of Pleasanton and City Attorney Lowell, and at the approved of direction and order of co-defendant Aljoe.

## CLAIM 2
**Denial of Procedural Due Process on Unreasonable Seizure and Abatement of Leroy's Vehicle**
Plaintiff Leroy v. Defendants Aljoe, Lowell, Thomas, Wickboldt, Sgt. Leong, Does 1-10, and City of Pleasanton ("Defendants")

32. Leroy was unlawfully permanently deprived of his Mazda truck without due process of law by Pleasanton Police Officer Sgt. Robert Leong ("Officer Leong") who refused to release it to him pursuant to abatement without due process of law. Its unlawful seizure and permanent deprivation without due process of law was set in motion by the agreement and meeting of the minds of Defendants Aljoe, Lowell, G. Thomas, Wickboldt, and Does 1-10 at and before and after the Oct. 21, 2011 inspection of plaintiffs' house. Defendants jointly and severally acted, participated in, or directed its unlawful seizure, abatement, and permanent deprivation without due process of law.

33. Defendants' seizure and permanent deprivation of Leroy's Mazda truck was without due process of law was unlawful in violation of the 14th Amendment of the United States Constitution for the following reasons: (a) Defendant Leong refused release it to Leroy upon his offer to pay the fees in violation of CVC § 22850.3, which required its release. (b) It was seized and Leroy was permanently deprived of its possession without notice and opportunity for a hearing on its seizure and abatement by the City of Pleasanton, and without an administrative order or judgment of abatement. (c) A pre-deprivation hearing is required for abatement of a

vehicle. (d) Defendants' seizure and permanent deprivation of Leroy's Mazda without due process of law were intentional violations of plaintiffs' constitutional rights, and were malicious, in bad faith, and pursuant to defendants' improper agreed to purpose of permanently and unlawfully depriving plaintiffs of their house and personal property without due process of law.   (e) This was the 2nd act of a series of unlawful acts, pursuant to custom, policy and practice of the City of Pleasanton and City Attorney Lowell, and at the approved of direction and order of co-defendant Aljoe.

### CLAIM 3
**Acts 1-2 in Furtherance of an Overall Unlawful Conspiracy to Unreasonably Seize and Permanently Deprive Plaintiffs of their House and Property without Due Process of law**
Plaintiff Leroy v. Defendants Aljoe, Lowell, Thomas, Wickboldt, Does 1-10, and City of Pleasanton ("Defendants")

34. Defendants jointly and severally acted and agreed and had a meeting of the minds - pursuant to (a) communications at the meeting between Aljoe and Lowell after Aljoe visited plaintiffs' house and property, (b) communications and meetings related to Aljoe's application for the inspection warrant, (c) communications and meetings at the Oct. 21, 2011, inspection of plaintiffs' house and property, and (d) communications and meetings after the Oct. 21, 2011 inspection of plaintiffs' house and property - to unlawfully seize, abate, and permanently deprive Leroy of his  Mazda truck without due process of law. These were the 1st and 2nd unlawful acts in furtherance of Defendants' overall unlawful conspiracy to maliciously, intentionally and unlawfully deprive plaintiffs of their house and personal property without due process of law, and in violation of their further rights, privileges and immunities secured by the Constitution and laws of the United States, the State of California, and the City of Pleasanton.

### II. STATEMENT OF FACTS AND CIRCUMSTANCES GIVING RISE TO CLAIMS  4-6

35.  Plaintiffs incorporate herein by reference each and every allegation in the foregoing ¶¶ 1-34, and in the following ¶¶ 42-160, as though fully set forth herein.

36.  On Dec. 1, 2011, a Notice and Order to Repair and Abate ("Notice and Order") was issued and posted on plaintiffs' house, by defendants Wickbold, G. Thomas, and the City,

ordering plaintiffs to "Vacate Immediately" and "Repair or Demolish and Abate." The Notice and Order included notice that "occupying or entering the building, or any portion thereof **will** result in the arrest of the occupants for a misdemeanor violation of the Pleasanton Municipal Code and the State Building Standards Code" (emphasis in original). The Notice and Order was issued according to the direction and order of co-defendant Aljoe. The Notice and Order was not properly served and consequently did not give plaintiffs timely notice of their unreasonably abbreviated 10 day time-limit stated for an appeal.

37.　On or about Dec. 1, 2011, the first of multiple consecutive "red tag" notices with the bold capital letters "**DO NOT ENTER OR OCCUPY**" was posted on plaintiffs' house by Wickboldt. Due to the order not to enter his house, under threat of arrest, Leroy lost use of and access to his valuable personal property and family memorabilia stored in the house, and lost use of his house. Plaintiffs were further denied the right to vacate their personal property, and abate the alleged violations themselves by the prohibition of their entry to their house.

38.　After the time specified for abatement and repair had expired, no hearing was called or held by G. Thomas as required by Pleasanton Dangerous Buildings Code ("PDBC") § 20.32. 020.4.01B6 which requires that defendant G. Thomas, the City Building and Safety Official who issued the order, "shall call and have a full and adequate hearing upon the matter."

39.　Instead of G. Thomas calling the required hearing, on Feb. 3, 2012, City abatement consultant co-defendant Aljoe sent plaintiffs a "Final Notice" and "Demand to Abate" stating that legal action would be commenced upon failure to comply with the letter's demands by February 15, 2012. Aljoe's letter was copied to the City Attorney's office, and to G. Thomas and Wickboldt.

40.　On Aug. 3, 2012, the City filed a Petition to Appoint a Receiver. Defendant Aljoe was listed as Special Counsel for the City on the title page under the name of defendant City Attorney Lowell. Aljoe signed the Petition under the name and authority of Lowell.

41.　No administrative hearing was held on the Notice and Order to Repair and Abate before the City's Petition to appoint a receiver was filed, as required by the PDBC, nor on its order and "red tag" notice to plaintiffs not to enter their house under threat of arrest. The City

failed to hold the required hearings under the direction and order of co-defendant Aljoe.

## CLAIM 4

**Denial of Required Administrative Due Process on Notice and Order and Failure to Exhaust Administrative Remedies**

Plaintiffs v. Defendants G. Thomas, City of Pleasanton, Does 1-10 ("Defendants")

42.  Defendants Wickboldt, G. Thomas, City of Pleasanton, and Does 1-10 jointly and severally acted, participated in or directed, and agreed and had a meeting of minds to set in motion the unlawful denial to plaintiffs of the administrative process due on the Dec. 1, 2011 Notice and Order issued to plaintiffs by G. Thomas.  Pursuant to this agreement and meeting of the minds, Defendant G. Thomas failed to call and hold a hearing  on the Notice and Order as he was required to do by the Pleasanton Municipal Code before the City filed moved forward with its legal action and petition to appoint a receiver.

43.  Defendants' failure to call a hearing before the City filed its Petition, constituted a failure to provide the procedural process due in violation of the PDBC, California law, and the 14th Amendment of the United States Constitution for the following reasons: (a) G. Thomas was required to call and hold a hearing by PDBC § 20.32.020.4.01B6. (b) Defendants' failure to call and hold the required administrative hearing was a failure by the City to exhaust its administrative remedies, a required jurisdictional prerequisite to filing the petition to appoint a receiver.   (c) Defendants' failure to call and hold the required hearing was an intentional violation of plaintiffs' PMC, state common law, and constitutional rights, and was malicious, in bad faith, and pursuant to Defendants' agreed to improper purpose of permanently and unlawfully depriving plaintiffs of their house and personal property without due process of law. This was the 3rd act of a series of unlawful acts, pursuant to custom, policy and practice of the City of Pleasanton and City Attorney Lowell, and at the approved of direction and order of co-defendant Aljoe.

## CLAIM 5

**Denial of Procedural Due Process on Order Barring Plaintiffs from Entering their House**

Plaintiffs v. Defendants G. Thomas, City of Pleasanton, Does 1-10 ("Defendants")

44. Defendants G. Thomas, City of Pleasanton, and Does 1-10 jointly and severally

acted, participated in or directed, and agreed and had a meeting of minds to set in motion the unlawful denial to plaintiffs of a hearing on the Dec 1, 2011 Order barring plaintiffs from entering their house.  Pursuant to this agreement and meeting of the minds, G. Thomas failed to call and hold a hearing on the order barring plaintiffs from entering their house.

45. Defendants' failure to call and hold a hearing on the order barring plaintiffs from entering their house was in violation of plaintiffs' procedural due process rights under the 14th Amendment of the U.S. Constitution for the following reasons: (a) The order barring plaintiffs from their house was issued without underlying statutory authority, or competent procedural protections. (b) Plaintiffs' entry into their house for the purpose of vacation of their personal property, and doing the work required to abate the violations is a protected right under the State Housing Law, Pleasanton Municipal Code, and the 4th Amendment.  (c) Denial of entry by plaintiffs to their house required a pre-deprivation hearing. (d) Defendants' failure to call and hold a hearing on the order barring plaintiffs from entry to their house was an intentional violation of plaintiffs' constitutional rights, and was malicious, in bad faith, and  pursuant to Defendants' agreed to improper ultimate planned purpose of permanently and unlawfully depriving plaintiffs of their house and personal property without due process of law.  (e) This was the 4th act of a series of unlawful acts, pursuant to custom, policy and practice of the City of Pleasanton and City Attorney Lowell, and at the approved of direction and order of defendant Aljoe.

## CLAIM 6
**Acts 3-4 in Furtherance of an Overall Unlawful Conspiracy to Unreasonably Seize and Deprive Plaintiffs of their House and Personal Property without Due Process of Law**
Plaintiffs v. Defendants Aljoe, Lowell, Wickboldt, G. Thomas, Does 1-10, and City of Pleasanton ("Defendants")

46. Defendants jointly and severally acted, participated in or directed, and agreed and had a meeting of the minds - pursuant to (a) communications and meetings related to the City's contract with Aljoe, (b) communications at the meeting between defendants Aljoe and Lowell after Aljoe visited plaintiffs' house and property, (c) communications and meetings at and related to the Oct. 21, 2011 inspection of plaintiffs' house and property, and (d) communi-

cations and meetings related to the notice and order - to unlawfully deny and deprive plaintiffs of the hearing required by the Pleasanton Dangerous Building Code, and to unlawfully deny plaintiffs competent procedural protections on the order denying them entry into their house. These were the 3rd and 4th unlawful acts in furtherance of Defendants' overall unlawful conspiracy to maliciously, intentionally, and unlawfully deprive plaintiffs of their house and personal property without due process of law, and in violation of their further rights, privileges and immunities secured by the Constitution and laws of the United States, the State of California, and the City of Pleasanton.

### III. STATEMENT OF FACTS AND CIRCUMSTANCES GIVING RISE TO CLAIMS 7-8

47. Plaintiffs incorporate herein by reference each and every allegation in the foregoing ¶¶ 1-46, and in the following ¶¶ 62-160, as though fully set forth herein.

48. Upon receiving the Notice and Order issued by G. Thomas On Dec. 1, 2011, stating that "occupying or entering the building, or any portion thereof **will** result in the arrest of the occupants for a misdemeanor violation of the Pleasanton Municipal Code and the State Building Standards Code" (emphasis in original), Leroy immediately vacated his person from his only home for the previous 46 years. Leroy has been homeless since the date the Notice and Order was issued. His homelessness has resulted in his declining health, and he has suffered significant emotional distress caused by the circumstances of the seizure of his house. He currently sleeps in a truck with no toilet, no electricity and no running water.

49. In response to the Notice and Order Leroy also immediately replaced the roof that had been cited in the Notice and Order as a source of leaks for a cost of $14,000. He also went to the office of G. Thomas to discuss the Order to Repair and Abate. G. Thomas initially told Leroy that "if you need more time, just come in and ask." G. Thomas, however, denied more time when plaintiffs did ask for it, and did so pursuant to the direction and order of co-defendant Aljoe.

50. Leroy had used his house and property for storage of valuable personal property of mechanical nature and uses. including, but not limited to expensive American made tools and

heavy machinery, racing engines, engine parts and supplies, top of the line American made compressors, precision machining and measuring tools, iron workers and welding tools, machinery, supplies and cables, steel and aluminum tubing and sheets for projects, and iron worker's tools. The most valuable things of this nature were stored in his garage. Leroy has made a lengthy handwritten list of these things. Leroy's estimate of its value is based on market value and replacement cost. The value of some of the items is determined on the basis that they were rare and collectible.

51.  Leroy's use of his house for storage was the cause of multiple cited State Housing Law violations that constituted alleged dangers to an occupant.  The removal of his stored personal property from his house was necessary to correct those violations, and to make entry to the house, and repairs to the house, due to water damage, possible.

52. In spite of the threats of arrest if they entered the house, plaintiffs initially made several attempts to vacate Leroy's personal property from the house, but each time they did so, the City posted a dated red tag, stating "**DO NOT ENTER OR OCCUPY**," on the front door of the house. The City posted these red tags pursuant to the direction and order of co-defendant Aljoe.

53. After these postings occurred, plaintiff Craig J. Spitzer ("Craig") visited the office of G. Thomas to ask for a permit to enter the house, but was denied a permit, because G. Thomas said he would not issue a permit until the interior of the house could be entered and inspected. This paradoxically required vacating Leroy's personal property, which was not permitted under threat of arrest. The denial of the permit, thereby, further prevented plaintiffs from vacating their personal property from the house and correcting the cited violations related to its storage. G. Thomas denied the permit to enter the house pursuant to the direction and order of co-defendant Aljoe.

54.  The order not to enter the house under threat of arrest, the posting of multiple red tag notices after plaintiffs attempted to vacate it, and G. Thomas' refusal to permit plaintiffs to enter the house, chilled plaintiffs' exercise of their constitutional right to enter their house to remove and vacate Leroy's personal property which was necessary to make entry, meaningful

inspection, and repairs possible, and coerced them to forego their right to do so.

55. In March 2012, in response to communications from a frustrated Craig, a national TV producer offered to pay for the entire clean-up of plaintiffs' house in exchange for filming and broadcasting the work. The City and defendant Aljoe, who were informed of this offer by the producers, stated to the producer that there "was not enough time" to allow the producers to film abatement of the conditions for a TV show. Instead of permitting this no cost and timely option, the City filed a petition to appoint a receiver four months later. As of the date of this complaint, plaintiffs' house is still in receivership and repairs have not been completed. If the TV producer's clean-up had been permitted, the house would have been promptly cleaned-up and repaired at low cost to plaintiffs. The City unreasonably denied the TV producer's clean-up offer pursuant to the advice and direction of co-defendant Aljoe.

56. After being served statutory notice of the City's intention to file a petition to appoint a receiver in June 2012, Leroy obtained the help of friends who came to his aid because, as Leroy told them, he was threatened with losing his house. Leroy and his helper-friends entered the house sometime in July 2013, in spite of the threat of arrest for doing so.  They, and Leroy, worked continuously and vigorously, to vacate Leroy's valuable personal property from the house, and transported it by truck to a storage unit. During the clean-up the workers provided by one of Leroy's friends repeatedly asked "What's this? and "Can I have this?" indicating that what they were removing from the house was valuable. This clean-up work well beyond the capacity of Leroy, aged 73 at the time, to do himself, and was a substantial part of the work necessary to abate the conditions cited in the Notice and Order.

57. On Aug. 3, 2012, the City filed, but did not serve to plaintiffs a petition to appoint a receiver. Aljoe is listed as Special Counsel for the City on the title page of the Petition under the name of City Attorney Lowell. Aljoe signed the Petition, under the name of Lowell**,** as was done in all the City's court filed papers. The petition pleaded "the posting (red-tag) of a notice prohibiting entry and advising it is a misdemeanor to enter or occupy the building."

58. On Aug. 9, 2012, while Leroy and his helper-friends were working vacating Leroy's personal property from his house, Wickboldt appeared carrying a red tag containing the warning

"**DO NOT ENTER OR OCCUPY**." He stated to them "We have discussed this and decided to post this red tag." Wickboldt posted the red tag pursuant to the direction and order of co-defendant Aljoe.

59. Leroy and his helper friends discussed the posting of the red tag and decided to continue to work and risk arrest for doing so, but decided to work from the back entrance to the house instead of the front entrance as they had previously been doing.

60. Shortly after Wickboldt posted the red tag on Aug. 9, on Aug 14, Aljoe gave notice to plaintiffs of an ex parte hearing to appoint a receiver. In a phone call to plaintiff Craig Spitzer ("Craig"), Aljoe told him "You don't have to come to the hearing, the application is only to request a hearing date." Although Aljoe had ample time to do so, she did not serve plaintiffs the ex parte application to appoint a receiver before the hearing causing plaintiffs to be uncertain about what the ex parte application, or the hearing was about.

61. The Notice and Order was issued Dec. 1, 2011. It wasn't until after plaintiffs and their helper-friends had begun to make substantial progress in abating the cited conditions in July, that Plaintiffs' house and property suddenly became in alleged need of summary appointment of a receiver by ex parte application.

## CLAIM 7

**Unreasonable Seizure of Plaintiffs' House and Personal Property by Notice and Order Unreasonably Barring Plaintiffs from Entering their House Under Threat of Arrest**
Plaintiffs v. Defendants G. Thomas, Wickboldt, Does 1-10, and City of Pleasanton ("Defendants")

62. Defendants jointly and severally acted, participated in or directed, and agreed and had a meeting of the minds to set in motion the unlawful seizure of plaintiffs' house and Leroy's personal property contained in it. Pursuant to this agreement and meeting of the minds by Wickboldt, G. Thomas, the City, and Does 1-10, G. Thomas issued and signed, and Wickboldt posted on the front door of plaintiff's house a Notice and Order dated Dec.1, 2011, stating "occupying or entering the building, or any portion thereof **will** result in the arrest of the occupants for a misdemeanor violation of the Pleasanton Municipal Code and the State Building Standards Code" (emphasis in original). Pursuant to this agreement and meeting of the minds,

Wickboldt also posted multiple "red tags" on the front door of plaintiffs' house stating in bold capital letters, "**DO NOT ENTER OR OCCUPY**,

63. The Notice and Order and the posted red tags denying plaintiffs' entry to their house under threat of arrest were an unreasonable seizure of plaintiff's house in violation of the 4th Amendment of the U.S. Constitution for the following reasons: (a) There was no underlying statutory authority, no competent procedural protections, and no reasonable basis for barring plaintiffs from entry to their house. (b) It was unreasonable to bar plaintiffs from entry to their house under threat of arrest because it prevented them from accessing Leroy's personal property stored in the house, prevented them from vacating the house of Leroy's personal property, and prevented them from doing the clean-up work that was a necessary act preliminary to or incidental to repair of the house.  (c) Entry into their house for the foregoing purposes is a right protected by the City's Dangerous Building Code § 20.32.020.7.03**,** and the State Housing Law (California Health and Safety Code § 17971).  (d) Defendants' barring of plaintiffs from entry to their house under threat of arrest was an intentional violation of plaintiffs' constitutional rights, and was malicious, in bad faith, and pursuant to Defendants' agreed to improper ultimate purpose of permanently and unlawfully depriving plaintiffs of their house and personal property without due process of law. (e) This was the 5th act of a series of unlawful acts, pursuant to custom, policy and practice of the City of Pleasanton and City Attorney Lowell, and at the approved of direction and order of co-defendant Aljoe.

### CLAIM 8
**Act 5  in Furtherance of an Overall Unlawful Conspiracy to Unreasonably Seize and Deprive Plaintiffs of their House and Personal Property without Due Process of Law**
Plaintiffs v. Defendants Aljoe, Lowell, G. Thomas, Wickboldt, Does 1- 10, and City of Pleasanton ("Defendants")

64. Defendants jointly and severally acted, participated in or directed, and agreed and had a meeting of the minds – pursuant to (a) communications and meetings related to the City's contract with Aljoe, (b) communications at the meeting between defendants Aljoe and Lowell after Aljoe visited the property, (c) communications and meetings related to Aljoe's application for the inspection warrant, (d) communications and meetings at and related to the Oct. 21, 2011

inspection of plaintiffs house and property, and (e) communications and meetings before and after the notice and order was issued - to unlawfully seize plaintiffs' house and Leroy's personal property contained in it by unreasonably ordering them not to enter their house under threat of arrest. This was the 5th unlawful act in furtherance of Defendants' overall unlawful conspiracy to maliciously, intentionally, and unlawfully deprive the plaintiffs of their house and personal property without due process of law, and in violation of their further rights, privileges and immunities secured by the Constitution and laws of the United States, the State of California, and the City of Pleasanton.

## IV. STATEMENT OF FACTS AND CIRCUMSTANCES GIVING RISE TO CLAIMS 9-13

65. Plaintiffs incorporate herein by reference each and every allegation in the foregoing ¶¶ 1-64, and in the following ¶¶ 90-160, as though fully set forth herein.

66. On Aug 23, 2012, a hearing on the City's ex parte application for appointment of a receiver was held. The City, by and through its attorneys Special Counsel Aljoe and City Attorney Lowell, served the ex parte application and the petition to appoint a receiver to plaintiffs in the courtroom on the day of the hearing. The summons has never been served to plaintiffs, unrepresented at the time it mattered, depriving them of notice of their right and duty to file responsive pleadings, which they nevertheless filed.  No trial has been scheduled or held in spite of plaintiffs multiple requests for it.

67. By the time of the ex parte hearing, virtually all of Leroy's valuable personal property stored in his house had been removed. Only household related items remained, making entry to all rooms of the house possible, correcting, thereby, the Petitions' and Ex parte Applications' pleading that entry into the house was not possible, and substantially correcting the City's pleading of lack of emergency ingress and egress. The City's ex parte application and Petition pleadings were made false by this and other considerable clean-up work plaintiffs and their helper-friends had done prior to and after the filing of the petition and prior to the filing of the Ex Parte application.

68. Plaintiffs filed a sworn response to the City's ex parte application stating and providing photographic evidence of the on-going work they had done to abate the cited and pleaded conditions. The judge considered the matter in chambers and denied the City's application, but issued an order to plaintiffs to show cause why a receiver should not be appointed. The order stated that the City's reply to plaintiffs' scheduled response "is waived."

69. After the judge's decision was announced in the courtroom by the courtroom clerk, and before the judge's order was issued, defendant Aljoe asked the clerk to ask the judge to grant the City an order restraining the plaintiffs from entering their house. The clerk left the courtroom then returned and reported to Aljoe that her request was denied by the judge.

70. After her request was denied, defendant Aljoe approached Leroy and one of his helper-friends, Tom Jensen ("Tom"), who attended the hearing, and loudly and emphatically stated to them in a threatening manner at close quarters "I don't want to hear anything more about you entering the house.  If you enter the house again, I will have you arrested." Aljoe made a similar threat to plaintiff Craig who was waiting to speak to the court clerk.

71. After the ex parte hearing, Leroy sent a letter to City Attorney Lowell with a copy sent to the Pleasanton City Manager. The letter contained Leroy's complaints about the conduct of Aljoe, G. Thomas, and Wickboldt at and before the ex parte hearing. Attached to the letter was evidence of the complained of misconduct.

72. On Aug. 24, the day after the hearing on the ex parte application, Wickboldt sent plaintiffs a letter "Re: Notice of Scheduled Inspection" for Aug. 29, 2012 stating "The City of Pleasanton has scheduled an inspection of your property to evaluate current condition of the interior and exterior as it relates to compliance with the Notice and Order issued December 1, 2011." The letter was sent pursuant to the direction and order of co-defendant Aljoe.

73. In Response to the letter, Leroy called Wickboldt and asked him to delay the inspection because the clean-up of the interior of the house was not yet complete, and because the interior of the house was generally in a state of disarray.

74. On or about Aug. 27, 2012, Defendant Wickboldt appeared at the property in the company of Pleasanton police officers J. Chin # 274, and J. Nicely (# unknown).   At

Wickboldt's behest, the police officers told Leroy and his helper-friends who were present that entering the house was a misdemeanor and anyone who entered the house would be arrested.

75. When Leroy's helper-friend, Tom, objected that they had a right to enter and vacate the house of Leroy's personal property and clean it up enough to make inspection meaningful and repair possible, the police officers replied that the only circumstance they would recognize as lawful entry was a court order permitting it.

76. In response to Tom's question about who sent him, Wickboldt admitted that co-defendant Aljoe had directed him to make this threat to them.

77. As the result of this threat of arrest, Leroy and his helper-friends were coerced to not enter the house to finish the clean-up. They were, thereby, forced to leave the house in its state of interrupted clean-up work and disarray. They worked outside, instead, and cleared the side areas of the house and abated the cited condition of lack of emergency ingress and egress through the side yards.  This work, the previous replacement of the roof, and the removal of the stored items from the house, substantially corrected the alleged dangerous conditions before the show cause hearing.

78. On Aug. 27, 2012, G. Thomas and Wickboldt appeared at the house asking to conduct the inspection they had scheduled in the Aug. 24 letter sent to Leroy by Wickboldt. Plaintiffs granted them permission to inspect the interior of the house on the understanding that they would then be permitted to enter the house to finish their clean-up work. While Wickboldt and G. Thomas were inspecting the exterior of the house, one of them said to Leroy's helper-friend, Tom, "You've done a lot of work," which was certainly true.  Wickboldt took many photographs of both the interior and exterior of the house that they later used selectively and self-servingly in a surprise "Supplemental Declaration" served on plaintiffs and filed in the courtroom on the day of the order to show cause hearing.

79. The so-called Courtesy Building Inspection Report authored by defendant G. Thomas that resulted from the inspection stated that "Craig Spitzer requested that we perform a courtesy building inspection in order to establish the basis for obtaining a building permit to abate the hazardous conditions …."  This was a false statement.  It was defendant Wickboldt's

Aug. 24 letter that had initiated the inspection, not plaintiffs. The inspection was a pretext to gain a corrupt advantage at the order to show cause hearing.

80.   Several days after the inspection, on Aug. 29, 2012, Wickboldt, and Pleasanton police officer Bradley # 134 came to the property while Leroy and Tom were working in the backyard. Bradley was dispatched to plaintiffs' house pursuant to the request of the "City Attorney."  Wickboldt and Bradley entered the backyard without a warrant and without verbal permission to enter. Police officer Bradley entered on Wickboldt's direction and order that he do so. Wickboldt put white tape on the back entrance to the house and said that if it was broken it would serve as evidence of unlawful entry into the house. The white tape promptly fell off. Wickboldt returned again several days later accompanied by another (unidentified) police officer while Leroy and Tom were working in the backyard and stapled black tape over the back entrance. Wickboldt and the police officer again entered the back yard without a warrant and without verbal permission to enter. Wickboldt did these things pursuant to the direction and order of co-defendant Aljoe.

81. On Sep. 5, 2012, plaintiffs filed a sworn response to the order to show cause ("Response").  Their Response contained photographic evidence of the extensive clean-up work that they had done to the interior and exterior of the house, showing that the roof had been replaced, that the front yard was clean and clear, that the side and back yards adjacent to the house were clean and clear, that emergency ingress and egress was unimpeded, and that the interior of the house had been cleared of stored items.

82. Plaintiffs' Response also complained they had been barred from entry to the house under threat of arrest since the Notice and Order had been issued, threatened with arrest at the ex parte hearing by defendant Aljoe if they entered the house to do any further clean-up work, and threatened again with arrest at Aljoe's direction after the hearing.

83. The court's tentative ruling issued on 9/10/2012 stated, among other things, that "Pleasanton is to be prepared to address whether the Spitzers were permitted to enter the building to make repairs …, [and] the Spitzers are to permit Pleasanton to enter the property and to take photographs regarding the current status of the property. On or before Sept. 17, 2012, the

THIRD AMENDED COMPLAINT                                    CV 13-5442 MEJ

parties may submit declarations with current information regarding the status of the property."

84. At the show cause hearing, attended by Wickboldt, the City, by and through its attorneys Special Counsel Aljoe and City Attorney Lowell, served and filed a "Supplemental Declaration of George Thomas with Exhibits" ("Supplemental Declaration") to plaintiffs in the courtroom. This document was a complete surprise to plaintiffs, and was in violation of the Order to Show Cause which stated that a reply by the City to plaintiffs' response "was waived."

85. The City, by and through its Special Counsel Aljoe and City Attorney Lowell, also presented a surprise witness, Livermore-Pleasanton Fire Marshall Scott Deaver, in violation of California Rules of Court that require prior notice to plaintiffs that a witness will testify at a hearing on a motion.  Deaver testified falsely that plaintiffs could not lawfully transport the household chemicals at plaintiffs' house that they had properly gathered together for purposes of disposal during their clean-up.  Plaintiffs as homeowners are exempted from transportation license requirements. Deaver's false testimony on this and other matters was knowingly suborned by Aljoe.  Deaver was also not qualified to testify on hazardous materials disposal because he was a Fire Marshall, not a qualified state Certified Uniform Program Agency Haz Mat inspector. Aljoe knew this was true and maliciously and intentionally presented Deaver as a qualified Haz Mat expert with knowledge of hazardous materials transportation and other law when she knew he was not. No hazardous materials inspection was ever done at plaintiffs' house, and no inspection was required.

86. The City, and defendant Aljoe, also falsely testified as an abatement consultant at the hearing that mold contamination in plaintiffs' house was a health and safety hazard. Mold contamination is not mentioned in the State Housing Law or the Pleasanton Dangerous Buildings Code, a hazardous mold condition is not mentioned in the Notice and Order.  Mold is, also, is not recognized as a health and safety hazard, or regulated under California law. City abatement consultant and defendant Aljoe knew or should have known this was true. Furthermore, the source of moisture that caused the mold was eliminated by replacing the roof in December, 2011, the interior of the house was completely dry, and the mold was not active and producing spores, and was thereby abated. This occurred well before the City's Petition was

filed. City abatement consultant defendant Aljoe knew or should have known this was true.

87. The title page of the City's Supplemental Declaration, signed by Aljoe, contained her false and misleading statement that "The observations and photographs are in direct contradiction to the respondents' claims they have abated the violations." The Declaration of Thomas falsely stated that there had been a "complete lack of meaningful abatement activities." Aljoe maliciously and intentionally suborned G. Thomas' false statement.

88. Aljoe's surprise Supplemental Declaration further misrepresented the facts by omitting a government attorney's duty to mention and admit that plaintiffs had been barred from entering the house under threat of arrest by the Notice and Order, had been barred from entering and working in the house under threat of arrest since the Ex Parte Hearing by Aljoe's direct and indirect threats of arrest, and that plaintiffs and their helpers had been working diligently, and had "done a lot of work" which Aljoe, Wickboldt, and declarant G. Thomas knew was true.

89. After the show cause hearing, the City, by and through its Special Counsel Aljoe and City Attorney Lowell, repeatedly contended that the show cause hearing was a trial on the City's cause of action underlying the appointment of the receiver.

### CLAIM 9
### Unreasonable Seizure of Plaintiffs' House and Personal Property by Denial of Entry to House after the Ex Parte hearing by Verbal Threats of Arrest
Plaintiffs v. Defendants Wickboldt, G. Thomas, Other Does 1-10, City of Pleasanton ("Defendants")

90. Defendants jointly and severally acted, participated in or directed, and agreed and had a meeting of the minds to set in motion the unreasonable seizure of plaintiffs' house and Leroy's personal property, after the ex parte hearing on Aug. 23, 2012, by threatening plaintiffs and their helper friends with arrest if they entered their house to finish their clean-up work. Pursuant to this agreement and meeting of the minds by Wickboldt, G. Thomas, and Does 1-10, on or about Aug. 27, 2012, Wickboldt appeared at the property in the company of Pleasanton police officers J. Chin, and J. Nicely, and threatened Leroy and two of his helper friends with arrest if they entered Leroy's house to finish their clean-up work. Wickboldt and the Pleasanton police officers made this threat pursuant to the direction and order of co-defendant Aljoe. As the

result of this threat, Leroy and his helper-friends were coerced to not enter the house, which they were forced, thereby, to leave in a state of interrupted clean-up work and disarray.

91. Wickboldt's and the police officers' threats of arrest, agreed to by G. Thomas, and directed and ordered by Aljoe, are an unreasonable seizure of plaintiffs' house in violation of the 4th Amendment of the U.S. constitution for the following reasons: (a) There is no underlying statutory authority for denial to plaintiffs of entry to the house under threat of arrest, and there were no procedural protections. (b) There was no reasonable basis to bar plaintiffs from entry to their house for the purpose of the vacation of the house of Leroy's personal property and for doing the clean-up work which was a necessary act preliminary to and incidental to repair of the house. (c) Entry for the purpose of doing necessary work preliminary to or incidental to repair of the house does not require a building permit, and is a right protected by the City's Dangerous Building Code § 20.32.020.7.03 and the State Housing Law, California Health and Safety Code § 17971. (d) Aljoe's request for a restraining order at the ex parte hearing was denied by the ex parte judge. Aljoe's threats to plaintiffs and their helper friend in the courtroom and by and through Wickboldt and Pleasanton police officers were extra-judicial acts of seizure in contradiction to the judge's decision. (e) Defendants acted under the express direction and orders of City abatement consultant/Special Counsel Aljoe with the approval of City Attorney Lowell in support of the corrupt purpose of gaining a corrupt advantage in a court of law. (f) Defendants' threats of arrest and the purpose of them were intentional violations of plaintiffs' constitutional rights, and were malicious, in bad faith, and pursuant to Defendants' improper and agreed to ultimate purpose of permanently and unlawfully depriving plaintiffs of their house and personal property. (g) This was the 6th act, of a series of unlawful acts pursuant to custom, policy and practice of the City of Pleasanton and City Attorney Lowell.

## CLAIM 10
### Unlawful Entry into a Private Area of Plaintiffs' Property without Warrant or Permission to Enter
Plaintiffs v. Defendants Wickboldt, G. Thomas, Does 1-10, and City of Pleasanton ("Defendants")

92. Defendants Wickbolt, G. Thomas, and Does 1-10 jointly and severally acted,

participated in or directed, and agreed and had a meeting of the minds to set in motion the entry into a private area of plaintiffs' property without warrant or permission to enter for the purpose of further coercing plaintiffs and their helper friends from entering plaintiffs' house to finish their clean-up work. Pursuant to this agreement and meeting of the minds, on Aug. 29, 2012, Wickboldt, and Pleasanton police officer Bradley # 134 entered the fenced backyard of plaintiffs' house without a warrant and without verbal permission to enter.  Wickboldt returned again several days later, with another Pleasanton police officer (unidentified), and again entered the private backyard of Plaintiffs' house without warrant or permission to enter. The police officers entered the property in response to the direction and orders of Wickboldt, and co-defendant Aljoe

93. The warrantless entries by Wickboldt and the police officers, agreed to, directed  and set in motion by G. Thomas, Aljoe, and Does 1-10, are unlawful in violation of the 4th Amendment of the U.S. Constitution for the following reasons: (a) Warrantless entries are presumptively unreasonable. (b) Wickboldt and the accompanying police officers entered and put tape on the back door and threatened arrest if it was broken for the corrupt purpose of preventing plaintiffs from finishing the clean-up of their house before the order to show cause hearing. (c) Wickboldt and the police officers so acted pursuant to the direction and order of co-defendant Aljoe and with the approval of City Attorney Lowell in support of the corrupt purpose of gaining a corrupt advantage in a court of law.  (d) Wickboldt and the police officers' entry into a private area of plaintiffs' property without warrant or permission to enter was an intentional violation of plaintiffs' constitutional rights, and was malicious, in bad faith, and pursuant to Defendants' improper and agreed to ultimate purpose of permanently and unlawfully depriving plaintiffs of their house and personal property without due process of law. (e) This was the 7th act, of a series of unlawful acts pursuant to custom, policy and practice of the City of Pleasanton and City Attorney Lowell.

### CLAIM 11
**1st Amendment Retaliation and Denial of right to Meaningful Access to Courts by Threats of Arrest**
Plaintiffs v. Defendants G. Thomas, Wickboldt, Does 1-10, City of Pleasanton ("Defendants")

94. Defendants jointly and severally acted, participated in or directed, and agreed and had a meeting of the minds to retaliate against plaintiffs for their having filed a response to the City's Ex Parte application to appoint a receiver demonstrating the substantial on-going work they had done to clean-up their house and property. This showed that the City's ex parte application and Petition falsely represented the current condition of the property. Plaintiffs' response resulted in an unfavorable ruling for the City and its abatement consultant and Special Counsel Aljoe and City Attorney Lowell, and threatened an unfavorable ruling at the order to show cause hearing. After this event occurred, pursuant to Defendant G. Thomas' Wickboldt's, Does' 1-10, the City's agreement and meeting of the minds, and Aljoe's direction and order, Wickboldt and multiple Pleasanton police officers repeatedly threatened plaintiffs and their helper friends with arrest if they entered their house and coerced them to forego their right to enter the house and finish their clean-up work before the order to show cause hearing.

95.  Defendants' foregoing conduct is an unlawful denial of plaintiffs' rights of free speech, and meaningful access to the courts in violation of the 1st Amendment of U.S. Constitution for the following reasons: (a) Defendants' primary intent was to retaliate against plaintiffs for exercising their 1st Amendment rights of free speech and access to the court at the ex parte hearing by appearing and presenting a successful defense, and to deny them meaningful access to the court at the order to show cause hearing. (b) But for plaintiffs being prevented from entering their house to finish its clean-up, plaintiffs' would have had a meaningful opportunity to argue and for the court to find that appointment of a receiver was not necessary under the circumstances. (c) Defendants threatened plaintiffs to prevent them from entering their house under the express direction and orders of defendant Aljoe City and with the agreement of City Attorney Lowell for the corrupt purpose of gaining an advantage in a court of law.  (d) Defendants' foregoing conduct was an intentional violation of plaintiffs' constitutional rights, and was malicious, in bad faith, and pursuant to Defendants' improper and agreed to purpose of permanently and unlawfully depriving plaintiffs of their house and personal property without due process of law. (e) This was the 8th act, of a series of unlawful acts pursuant to custom, policy and practice of the City of Pleasanton and City Attorney Lowell.

**CLAIM 12**

**1st Amendment Retaliation and Denial of Meaningful Access to Courts by Fraud on the Court**

Plaintiffs v. Defendants G. Thomas, Wickbold, Other Does 1-10, City of Pleasanton ("Defendants")

96. Defendants jointly and severally acted, participated in or directed, and agreed and had a meeting of the minds to commit a fraud on the court by conspiring to produce false evidence and false testimony at the hearing on the order to show cause. Wickboldt's and Aljoe's coercion of plaintiffs to not enter their house to finish their clean-up by threats of arrest, Wickboldt's and G. Thomas' false statements that plaintiffs had not engaged in any "meaningful abatement activities," Aljoe's surprise witness' false allegation that plaintiffs could not transport and dispose of household chemicals, and Aljoe's false statment that mold in the Spitzer house was a hazardous condition subject to the court's jurisdiction was a fraud on the court that wrongfully influenced the judge's decision against plaintiffs' reasonable request to be permitted to finish the clean-up work instead of appointing a receiver.

97. Defendants' foregoing acts are an unlawful denial of plaintiffs' rights of free speech, and meaningful access to the courts in violation of the 1st Amendment of U.S. Constitution for the following reasons: (a) Defendants' primary intent was to retaliate against plaintiffs for exercising their 1st Amendment right of free speech and access to the court at the ex parte hearing by appearing and presenting a successful defense, and to deny them meaningful access to the court at the order to show cause hearing. (b) But for Defendants' fraud on the court, plaintiffs' would have had a meaningful opportunity to argue and for the court to find that appointment of a receiver was not necessary under the circumstances. (c) Defendants perpetrated a fraud on the court under the express direction and orders of City abatement consultant/Special Counsel Aljoe and with the approval of City Attorney Lowell for the corrupt purpose of gaining a corrupt advantage in a court of law. (d) Defendants' foregoing conduct was an intentional violation of plaintiffs' constitutional rights, and was malicious, in bad faith, and pursuant to Defendants' improper and agreed purpose of permanently and unlawfully depriving plaintiffs of their house and personal property without due process of law. (e) This was the 9th

act, of a series of unlawful acts pursuant to custom, policy and practice of the City of Pleasanton and City Attorney Lowell.

### CLAIM 13

**Acts 5-9 in Furtherance of an Overall Unlawful Conspiracy to Unreasonably Seize and Deprive Plaintiffs of their House and Personal Property without Due Process of Law**
Plaintiffs v. Defendants Aljoe, Lowell, G. Thomas, Wickboldt, Police Officer Does 2-3, Other Does 1-10, and City of Pleasanton ("Defendants")

98.  Defendants jointly and severally acted, participated in or directed, and agreed and had a meeting of the minds – pursuant to meetings and communications between Defendants at and after the ex parte hearing – to unreasonably seize  plaintiffs' house and personal property by denial to plaintiffs of entry to their house after the ex parte hearing by verbal threats of arrest and by unlawfully entering into a private area of plaintiffs' property without warrant or permission to enter for the purpose coercing them from entering their house; and to Retaliate against plaintiffs for the exercise of their rights to free speech, and deny plaintiffs  meaningful access to the courts by threats of arrest and fraud on the court. Defendants did these things for the express corrupt purpose of gaining a corrupt advantage in a court of law. These were the 5th – 9th  unlawful acts in furtherance of  Defendants' overall unlawful conspiracy to unlawfully deprive plaintiffs' of their house and personal property without due process of law, and in violation of their further rights, privileges and immunities secured by the Constitution and laws of the United States, the State of California, and the City of Pleasanton.

### V. STATEMENT OF FACTS AND CIRCUMSTANCES GIVING RISE TO CLAIMS 14 – 17

99. Plaintiffs incorporate herein by reference each and every allegation in the foregoing ¶¶ 1-98, and in the following ¶¶ 109-160, as though fully set forth herein.

100. After the show cause hearing, and before the order appointing the receiver was entered and filed, plaintiffs Leroy and Craig Spitzer were seized and arrested without warrant or probable cause on Sept. 17, 2012, at plaintiffs' house located at 4719 Orangewood Court, Pleasanton, California, for alleged manufacture of a controlled substance. They were seized and arrested while they were lawfully removing household chemicals from their property that they

had properly gathered together for purposes of sorting and disposal.

101. After seizing and handcuffing Craig at the gate into the private backyard of the house, Defendant Pleasanton police officer Ryan Tujague ("Tujague") entered the fenced backyard through the gate without a warrant or permission to enter.  He seized and handcuffed Leroy in the fenced backyard. After Tujague entered the backyard, several other Pleasanton police officers also entered it.

102. Leroy and Craig were then unlawfully imprisoned under constructive arrest in the back of a police car for about 4 hours. They remained handcuffed for this entire time. During this time, the heater in the car was left running at a high level. This high heat and being handcuffed for four hours caused them considerable discomfort.

103. While unlawfully imprisoned in the police car, Craig and Leroy observed that several of the police officers were holding cell phones to their ears and talking and listening for long periods of time. Craig and Leroy also observed that there were 3 police cars involved. Several fire engines, ambulances, and civilian vehicles also arrived. Craig and Leroy observed one or more firemen enter the back yard. They did so without a warrant.  Leroy believes that one of the persons in civilian clothes he saw was defendant Wickboldt.

104.  The arresting officer, defendant Tujague did not state any reason for his seizure and unlawful imprisonment of plaintiffs. They were not told any reason until they were being taken to jail, at which time they were told by the transporting officer that "you lost your house you're going to jail." Plaintiffs did not learn what they had been charged with manufacturing a controlled substance until they saw their Inmate Locator records obtained from the acgov.org website after they were released. The arrest records show a charge of trespassing crossed out.

105. Shortly after plaintiffs were booked in jail, the charges were dropped. They were released on the same day they were arrested.  When they returned to their house, they found a warrant posted.  The declaration of probable cause was not attached to the warrant. The date and time the warrant was issued was 9/17/12, 2:10 p.m., which was long after the Spitzers had been arrested and their house and property had been searched, and close to the time they were released from jail.

106. There was no probable cause for either the arrest or the warrant because there were no chemicals and no manufacturing apparatus at the property for the production of controlled substances, and no reasonable basis for believing there was.  The chemicals had been a subject of the show cause hearing on Sept. 12, 2012. The house and chemicals had previously been thoroughly inspected.  Multiple Pleasanton police officers had previously been in plaintiffs' backyard with Wickboldt, and had perceived no reason to suspect there were drug manufacturing chemicals present and drug manufacturing taking place.  On these bases, it was generally known that no drug manufacturing chemicals or drug lab was present on defendants' property. Tujague knew or should have known that there were only household chemicals on plaintiffs' property, and that there was no drug manufacturing lab there.

107. On the morning of the arrest, the City, by and through its Special Counsel Aljoe sent an improper ex parte email to the court which had held the order to show cause hearing, in which the order appointing the receiver was then pending.  In the email, Aljoe stated that plaintiffs were arrested "**this morning for possession of meth, along with all the chemicals (precursors) necessary to set up a methamphetamine lab!!**" (emphasis in original).  At the time she sent the email, Aljoe knew that there were no such chemicals or methamphetamine lab at plaintiffs' house.  She had inspected the house and property herself, and it had been thoroughly inspected by the persons who reported to her. The Order appointing the receiver was issued the next day. Plaintiffs are informed and believe that Aljoe did not send a follow-up email to the court admitting the charges were false and were dropped, and that plaintiffs had been released from jail without any further charges. Plaintiffs believe this erroneous communication was substantially prejudicial to this case.

108. Plaintiffs are informed and believe that City abatement consultant/Special Counsel Aljoe's and Defendants Wickboldt's, G.Thomas', and Does' 1-10  communications with the police department, plaintiffs' neighbors, and others set in motion the circumstances of the seizure of their persons.  They are further informed and believe that Aljoe knew plaintiffs were lawfully removing the chemicals that were the subject of the order to show cause hearing, and was improperly motivated to and did act to prevent plaintiffs from doing so before the order

appointing the receiver was entered and the receiver took over, as that would significantly erode the court's reason for the receiver's appointment. Plaintiffs are further informed and believe that Aljoe in doing these things acted outside the scope of her prosecutorial function and violated the duty of a government attorney to do justice, and not win at any cost.

## CLAIM 14

**Unlawful Seizure of Plaintiffs' Persons without Warrant or Probable Cause;**
Plaintiffs v. Defendants Wickboldt, G. Thomas, Ryan Tujague, Does 1-10, and City of Pleasanton ("Defendants")

109.  Defendants jointly and severally acted, participated in or directed, agreed and had a meeting of the minds to set in motion the unlawful seizure of plaintiffs' persons. Pursuant to this agreement and meeting of minds, Defendant Pleasanton police officer Ryan Tujague ("Officer Tujague") unlawfully seized plaintiffs' persons at their house on 2719 Orangewood Court on Sept. 17, 2012.  Defendants Wickboldt, G. Thomas, Does 1-10, and the City of Pleasanton agreed to and had meeting of the minds to set in motion the seizure of plaintiffs' persons by Officer Tujague.

110. Officer Tujague's seizure of plaintiffs' persons was unlawful in violation of the 4th Amendment of the U.S. Constitution for the following reasons:  (a) Plaintiffs' persons were seized, arrested, and booked in jail without warrant or probable cause. (b) The seizure was an intentional violation of  plaintiffs' constitutional rights, and was malicious, in bad faith, and pursuant to Defendants' improper and agreed to purpose of permanently and unlawfully depriving plaintiffs of their house and personal property without due process of law. (c) This was the 10th act, of a series of unlawful acts pursuant to custom, policy and practice of the City of Pleasanton and City Attorney Lowell.

## CLAIM 15

**Unlawful Entry and Search of Plaintiffs' House and Property Without Warrant,  Probable Cause, or Permission to Enter**
Plaintiffs v. Defendants Wickboldt, G. Thomas, Ryan Tujague, Does 1-10, and City of Pleasanton ("Defendants")

111.  Defendants jointly and severally acted, participated in or directed, and agreed and had a meeting of the minds, and set in motion the unlawful entry of a private area of plaintiffs'

property and the unlawful search of plaintiffs' house and property.  Pursuant to this agreement and meeting of the minds, Officer Tujague unlawfully entered and searched plaintiffs' house and property on Sept. 17, 2012.  Defendants Wickboldt, G. Thomas, Does 1-10, and the City of Pleasanton agreed to and had a meeting of the minds to set in motion the unlawful entry onto and search of plaintiffs' property by Officer Tujague.

112. Officer Tujague's entry onto and search of plaintiffs' house and property was unlawful in violation of the 4th Amendment of the U.S. Constitution for the following reasons: (a) The entry and search was without warrant, probable cause, or permission to enter and search. (b)  The entry and search was an intentional violation of plaintiffs' constitutional rights, and was malicious, in bad faith, and pursuant to Defendants' improper and agreed to ultimate purpose of permanently and unlawfully depriving plaintiffs of their house and personal property without due process of law, of which this was the 11th act, of a series of such unlawful acts pursuant to custom, policy and practice of the City of Pleasanton and City Attorney Lowell.

## CLAIM 16
### Unlawful Search of the Plaintiffs' House and Property With Unlawful Warrant
Plaintiffs v. Defendants Thomas, Wickboldt, Pleasanton Police Officer Ryan Tujague, Other Does 1-10, and City of Pleasanton ("Defendants")

113.  Defendants jointly acted, participated in or directed, and agreed and had a meeting of the minds, and set in motion the unlawful search of plaintiffs' house and property. Pursuant to this agreement and meeting of minds, plaintiffs' house and property was searched by Officer Tujague pursuant to an unlawful warrant that was improperly obtained and issued on the day of plaintiffs' arrest after the entry and search had been done.  Defendants Wickboldt, G. Thomas, Does 1-10, and the City of Pleasanton agreed and had a meeting of the minds to set in motion the unlawful search by Officer Tujague.

114. The warrant to search plaintiffs' property was unlawful, and improperly obtained and issued in violation of the 4th Amendment of the U.S. Constitution for the following reasons: (a) it was issued after the entry and search had been done, (b) It was applied for and issued after the plaintiffs were arrested and released without charges, (c) It was applied for and issued on the basis of an unreasonable seizure and false arrest, and (d) It was applied for and issued on the

basis of false swearing by Tujague.  (e) The application for and issuance of the warrant was an intentional violation of  plaintiffs' constitutional rights, and was malicious, in bad faith, and pursuant to Defendants' improper purpose of permanently and unlawfully depriving plaintiffs of their house and personal property without due process of law. (f)  This the 12th act, of a series of unlawful acts pursuant to custom, policy and practice of the City of Pleasanton and City Attorney Lowell.

### CLAIM 17

**Acts 9-12 in Furtherance of an Overall Unlawful Conspiracy to Unreasonably Seize and Deprive Plaintiffs of their House and Personal Property without Due Process of Law**

Plaintiffs v. Defendants Aljoe, Lowell, Thomas, Wickboldt, Pleasanton Police Officer Ryan Tujague, Other Does 1-10, and City of Pleasanton ("Defendants")

115. Defendants jointly acted, participated in or directed, and agreed and had a meeting of the minds – pursuant to (a) meetings and communications at and after the ex parte hearing, (b) meetings and communications at and after the show cause hearing, and (c) communications on and before the day of the plaintiffs' seizure – to unlawfully seize and imprison plaintiffs persons, unlawfully enter and search plaintiffs' property without a warrant or probable cause, and to unlawfully use the false arrest to influence the court.  Also, these meetings and communications allowed the police and others to unlawfully search Plaintiffs' house and property pursuant to an unlawful warrant, and did so as the 9th - 11th acts in furtherance of Defendants' overall unlawful conspiracy to unlawfully deprive plaintiffs of their house and personal property without due process of law, and their further rights, privileges and immunities secured by the Constitution and laws of the United States, the State of California, and the City of Pleasanton.

### VI. STATEMENT OF FACTS AND CIRCUMSTANCES GIVING RISE TO CLAIMS 18 – 22

116. Plaintiffs incorporate herein by reference each and every allegation in the foregoing ¶¶ 1-115, and in the following ¶¶ 132-160, as though fully set forth herein.

117. On Sept. 18, 2012, J. Benjamin McGrew ("McGrew") was appointed receiver under the California State Housing Law, California Health and Safety Code § 17980.7, giving

THIRD AMENDED COMPLAINT                    CV 13-5442 MEJ

him the authority to correct the cited violations of the State Housing Law. There is no mention in § 17980.7 of the personal property of the owner of a house subject to receivership and no powers over it are given to a State Housing Law receiver like there is given to a Bankruptcy trustee. The order appointing McGrew as receiver expressly required that the receiver seek prior approval of proposed contracts before they were executed. The Order appointing McGrew did not give McGrew the authority to dispose of plaintiffs' valuable personal property that was not, and could not be reasonably considered to be "debris, trash and rubbish," nor did it give McGrew authority to prevent plaintiffs' from removing it from the property, nor did any succeeding orders.

118.   McGrew did not file his receiver's oath until Sept. 25, 2012, and did not take possession of plaintiffs' real property until that day. McGrew falsely stated he had filed his required receiver's bond with his receiver's oath in his Initial Report filed on Nov. 24, 2012. His bond was not submitted to the court until Feb. 28, 2014. It was submitted only in response to plaintiff's information and requests to the court related to its not having been filed. McGrew's failure to file his bond before he took possession of Plaintiffs' real property violated California Code of Civil Procedure § 567.

119. After taking possession of the property, McGrew exercised his court-ordered discretion to allow plaintiffs to enter the property, and to work to vacate Leroy's remaining valuable personal property, and to do the court-ordered priority remediation work.  Plaintiffs were highly motivated to do the work themselves in order to keep the expenses of receivership low enough to allow them to keep possession of their house.

120. Plaintiffs promptly and lawfully removed the alleged health and safety hazards that were considered a priority by the appointing court, and its appointing order.  They did so before and immediately after the order was issued.  After finishing this work they cleaned the house to the bare floors, removing most of the water damaged sheet-rock and finish flooring, and all of the carpets, leaving all but two rooms of the house empty of contents and broom clean. The undamaged front bedroom was cleaned and used as storage for Leroy's household furniture. This clean-up remediated the priority removal of alleged hazardous materials ordered by the

appointing court, and eliminated the need for employing a clean-up contractor for these materials.

121.  As of the first of December, 2012, the only remaining clean-up was the garage and kitchen of the house, and the backyard where Leroy's remaining possessions had been stacked and sorted for removal or disposal.  No health and safety hazards remained there. At this time, plaintiffs' helper-friend, Tom Jensen, needed to take a break to catch up on his personal needs and obligations he had necessarily neglected to help his friends. Tom and Leroy reasonably estimated they needed only thirty more days to finish the clean-up and remediation.  Since no clean-up contracts could be approved and none were contemplated before a court hearing on March 19, 2013, Tom believed he could afford to take a needed break.  When he came back to work the clean-up would be finished before the scheduled March 19 hearing.

122. During this period, McGrew had admitted personal problems that he admitted interfered with his working, and he admitted he had not obtained financing for any contracts so that no contract work could have been done. This made permitting plaintiffs to do the clean-up and remediation work especially reasonable and efficacious under the circumstances.

123.  When Tom and Leroy returned to continue their clean-up work on or about the first week of February, 2013, he and Leroy worked only two days before McGrew abruptly, unreasonably, and permanently barred them from entry to the property, and from working to clean-up and vacate Leroy's remaining valuable personal property stored in his garage. McGrew barred them from entry to the property by ceasing all communications with plaintiffs, refusing to return multiple communications by multiple means from plaintiffs asking for his permission to enter the property. During this time, McGrew was actively communicating with the City, but not plaintiffs in violation of his duty of neutrality imposed by the California Rules of Court and common law, which he, thereby, violated.

124.  On July 17, 2013, almost four months to the day after Leroy and Tom would have vacated Leroy's remaining valuable personal property, and finished the clean-up of the house and property at no cost to the estate, McGrew executed a clean-up contract with a business entity called DECON for the estimated and only partial amount of over $113,000 without prior

approval of the court, in violation of the order appointing him, and in violation of California common law requiring prior approval of a receiver's contracts. McGrew executed the contract without prior notice to plaintiffs, without their having been provided an opportunity to be heard, and without their being provided an opportunity to remove Leroy's valuable personal property.

125. By its unlawful execution, plaintiffs unreasonably lost the cost of the DECON contract, through its charge by McGrew to the estate.  Leroy also lost about an equal value of his valuable personal property stored in his garage, and the furniture and personal items stored in the undamaged spare bedroom, which was given to charities, recycled for over $5,000 in cash, and converted by DECON personnel, without credit to the estate. ¶¶ 7, 50, and 56 are adopted and incorporated herein by this reference in support of the pleading that the personal property Leroy lost was in fact valuable and not merely trash, junk and debris. McGrew knew Leroy's personal property was valuable, and he knew the most valuable things were being converted by the DECON contractor and its workers.  Leroy personally observed the conversion of his valuable personal property on July 17, 2013, while the DECON workers executed the clean-up contract by their separating out and putting some items aside and in their trucks while tossing the rest in a dumpster for recycling.  McGrew deliberately failed to inventory Leroy's valuable personal property as required by the Rules of Court in order to conceal its value.

126. If plaintiffs had not been continuously barred from the property from early February, 2013, to the time the DECON contract was executed, Leroy would not have lost his valuable personal property. The costly clean-up contract would have been unnecessary, and Leroy's dignity would have been spared.

127. On Feb. 26, 2014 the Superior Court approved McGrew's request for permission to pay the clean-up contractor, DECON, but it did not address or approve of the fact that McGrew violated the order appointing him by not having prior approval of the court before it was executed, nor did it address or approve of the manner of McGrew's execution of the contract. All that the order did or could do was "approve" the payment of DECON.

128.  Plaintiffs learned through admissions by both defendants Aljoe and McGrew at a court hearing, that Aljoe had "chewed his [the Receiver's] head off" and "threatened to have

him removed" for allowing plaintiffs to enter the property to do remediation work. This threat to McGrew, by the City of Pleasanton, by and through its Special Counsel Aljoe, occurred immediately after Leroy and Tom returned to work in February, and was the cause of their being permanently barred from entry to the property by McGrew from that time onward.

129.  At the time Defendants' coercion of  McGrew to bar plaintiffs from the property in early February occurred, Leroy and Tom were within thirty days of finishing the clean-up. Plaintiffs would have had the clean-up completed by the next court hearing in March. At that time plaintiffs planned to ask the court to allow them to contract for the repair themselves, which would have been far less expensive and more expeditious than issuing receiver's certificates for the repair, and would have allowed them to keep expenses down by doing part of the work themselves. Aljoe, and Defendants Wickboldt, G. Thomas, Does 1-10, and the City of Pleasanton knew of these plans and were determined to prevent them from occurring because they didn't want plaintiffs to keep possession of their house.

130.  The City and its agent Defendants Wickboldt, G. Thomas, and Does 1-10, not only had knowledge of McGrew's planned execution of the DECON contract without prior approval of the court, but they also aided and abetted its unlawful execution by assisting, advising, agreeing to, and approving of its execution by McGrew without the prior approval of the court. The City and its agents and Defendants aided and abetted the unlawful execution of the DECON contract pursuant to the direction and order of City abatement consultant/Special Counsel Aljoe.

131.  McGrew has repeatedly violated his mandatory duties, and prejudiced and injured Plaintiffs by the following acts:

(a)  McGrew has repeatedly violated the California Rules of Court, and statutory and common law mandates by, including, but not limited to failing to be neutral, failing to seek advice from the court when it was needed, failing to obtain and file the required receiver's bond and falsely stating he had done so, failing to file the required inventory, failing to file required monthly reports, failing to appear as required at hearings, and failing to pay property taxes. McGrew has a record and history of such misconduct and violation of his duties as a receiver in

other cases in which he has been recently discharged for cause.  In this case, however, McGrew has been allowed by the supposedly supervising Superior Court to violate his duties with impunity and without admonishment, in spite of the court's full knowledge of his violations in plaintiffs' case, and its full knowledge of McGrew's similar violations in the cited other cases in which he was discharged for cause.

(b)   McGrew acted unlawfully by deliberately failing to give notice and permit plaintiffs to vacate Leroy's valuable personal property from his garage before it was finally deprived through execution of the DECON contract, and by deliberately violating common law and the order appointing him by executing the DECON contract without the required *prior* approval of the contract by the court. Neither McGrew, nor the supervising court had statutory authority over Leroy's valuable personal property. There is no mention of plaintiff's valuable personal property in the order appointing McGrew, McGrew deliberately concealed its value by failing to take the required inventory, and McGrew did not seek advice from the court regarding its disposition, nor prior approval of the court for its seizure and final deprivation.

(c)   McGrew acted unlawfully by appearing in this court in his purported official capacity. He did not seek, and did not have, the prior approval of the appointing court to appear required by California Code of Civil Procedure § 568.

(d)   McGrew acted unlawfully by recording a Deed of Trust on 5/28/2014 as security for debt against the plaintiffs' property in which he himself is unlawfully listed as grantor of title. The loan McGrew obtained by so doing is in violation of the usury prohibition of the California Constitution. A deed of trust, as opposed to a proper receiver's certificate, is used only for non-judicial sales. Receiver's sales must be pursuant to mandated judicial procedure. McGrew's act of granting title through a deed of trust as security for a loan is unlawful on multiple bases: 1) A receiver has no power to grant title which according to law remains in plaintiffs' possession until a court approved sale pursuant to mandated procedures occurs; 2) McGrew's unlawful granting of a deed of trust subverts the mandated judicial procedure for a receiver's sale; 3)  Subversion of the mandated judicial procedure deprives plaintiff Leroy of his statutory right to a Homestead Exemption.  In summary, the deed of trust unlawfully

permits the designated trustee to sell the property without the court approval in advance of such a sale that is mandated by statute for a sale by a receiver.

**CLAIM 18**

**Unreasonable Seizure and Final Deprivation of Leroy's Valuable Personal Property Pursuant to Unreasonable and Unlawful Execution of an Unreasonable and Unlawful Clean-Up Contract**

Plaintiffs v. Defendants Wickboldt, G. Thomas, Does 1-10, and City of Pleasanton ("Defendants")

132.   McGrew and Defendants Wickboldt, G. Thomas, Does 1-10, and the City of Pleasanton jointly acted, participated in or directed, aided and abetted, and agreed and had a meeting of the minds to unlawfully execute an unnecessary and unreasonably costly clean-up contract, and pursuant to its unlawful execution to seize and finally deprive Leroy of his valuable personal property stored in his garage.  Pursuant to this agreement and meeting of the minds, Defendants, by and through their agent and attorney Aljoe, coerced McGrew by threats to have him removed if he did not agree to unreasonably bar Leroy and his helper friend from entering the property in early Feb. 2013, and to execute an unreasonable and unlawful clean-up contract in mid-July 2013 without the required prior approval of the court. McGrew unlawfully agreed to do so. McGrew's unlawful execution to the clean-up contract resulted in the unreasonable seizure and final deprivation of Leroy's valuable personal property, and unreasonable and unnecessary costs to the estate. Defendants Wickboldt, G. Thomas, Does 1-10, and the City of Pleasanton directed, agreed to, approved of, and aided and abetted these acts by McGrew.

133. Defendants' acts, and McGrew's execution of the contract, and seizure and final deprivation of Leroy's valuable personal property  were unreasonable and unlawful in violation of the 4th Amendment of the U.S. Constitution for the following reasons:   (a) McGrew unreasonably and unlawfully executed the clean-up contract without prior approval of the court in violation of the order appointing him, without giving notice or the opportunity for a hearing to plaintiffs before its execution, and without any opportunity given to Leroy to vacate his valuable personal property before the contract was executed. (b) McGrew did not have authority

to dispose of Leroy's valuable personal property under the order or statute appointing him. (c) Barring Leroy and his helper friend from the property and from vacating Leroy's valuable personal property for over five months before the clean-up contract was executed, despite plaintiffs' repeated requests to enter the property, was unreasonable, and arbitrary and capricious. (d) But for Leroy and his helper friend being unreasonably barred from the property in early February, the clean-up cost to the estate would have been nothing, the clean-up would have been finished months sooner than it was by the execution of the clean-up contract, and Leroy would not have lost the considerable value of his personal property stored in the garage. (e) McGrew's and Defendants' agreement and meeting of the minds to unreasonably bar plaintiffs from the property and to execute the clean-up contract without prior approval of the court were in violation of  McGrew's legal duty of  neutrality, and the City's and its agents, Special Counsel Aljoe's, and City Attorney Lowell's legal and ethical duty to do justice and follow the law. (f) Defendants' proper source for any proper relief was by petition to the court, not by threats and coercion of McGrew. (g) Defendants' seizure and final deprivation of Leroy's valuable personal property was an intentional violation of Leroy's constitutional rights, and was malicious, in bad faith, and pursuant to Defendants' improper purpose of permanently and unlawfully depriving plaintiffs of their house and personal property without due process of law. (h) This was the 12th act, of a series of unlawful acts pursuant to custom, policy and practice of the City of Pleasanton and City Attorney Lowell.

## CLAIM 19

### Denial of Right to Procedural Due Process Prior to Execution of Contract and Seizure and Final Deprivation of Leroy's Valuable Personal Property

Plaintiffs  v. Defendants Wickboldt, G. Thomas, Does 1-10, and City of Pleasanton ("Defendants")

134. McGrew and Defendants Wickboldt, G. Thomas, Does 1-10, and the City of Pleasanton jointly acted, participated in or directed, and had a meeting of the minds to execute a clean-up contract, and seize and finally deprive Leroy of his valuable personal property without due process of law.  Pursuant to this agreement and meeting of the minds, Defendants, by and through their agent and attorney Aljoe, coerced McGrew by threats to have him removed if he

did not agree to unreasonably bar Leroy and his helper friend from entering the property in early Feb. 2013, and to execute an unreasonable and unlawful clean-up contract in mid-July 2013 without the required prior approval of the court.   McGrew unlawfully agreed to do so. McGrew's unlawful execution of the clean-up contract resulted in the unreasonable seizure and final deprivation of Leroy's valuable personal property, and unreasonable costs to the estate without due process of law. Defendants Wickboldt, G. Thomas, Does 1-10, and the City of Pleasanton directed, agreed to, approved of, and aided and abetted these acts by McGrew.

135.   Defendants' acts, and McGrew's execution of the clean-up contract, and McGrew's seizure and final deprivation of Leroy's valuable personal property were unlawful in violation of plaintiffs and Leroy's procedural due process rights under the 14th Amendment of the U.S. Constitution for the following reasons: (a) McGrew executed his clean-up contract without the required prior approval of the court in violation of the order appointing him, without notice or the opportunity for a hearing before its execution, and without any opportunity given Leroy to vacate his valuable personal property before the contract was executed.  (b) McGrew did not have authority over Leroy's valuable personal property under the order or statute under which he was appointed. (c) Barring Leroy and his helper friend from the property and from vacating Leroy's valuable personal property for over five months before the clean-up contract with DECON was executed, despite plaintiffs' repeated requests to enter the property, was unreasonable, and arbitrary and capricious.  (e) McGrew's and Defendants' agreement and meeting of the minds to execute the clean-up contract without prior approval of the court in violation of the order appointing McGrew, without notice or the opportunity for a hearing before its execution, and without any opportunity given Leroy to vacate his valuable personal property before the contract was executed were in violation of McGrew's legal duty of neutrality, and the City's and its agents, Special Counsel Aljoe's, and City Attorney Lowell's legal and ethical duty to do justice and follow the law. (g) Defendants' foregoing actions were intentional violations of plaintiffs' constitutional rights, and were malicious, in bad faith, and pursuant to Defendants' improper purpose of permanently and unlawfully depriving plaintiffs of their house and personal property without due process. (h) This was the 13th act, of a series of

unlawful acts pursuant to custom, policy and practice of the City of Pleasanton and City Attorney Lowell.

**CLAIM 20**

**1st Amendment Retaliation and Denial of Meaningful Access to the Courts**

Plaintiffs v. Defendants Wickboldt, G. Thomas, Does 1-10, City of Pleasanton ("Defendants")

136. McGrew and Defendants Wickboldt, G. Thomas, Does 1-10, and the City of Pleasanton jointly and severally acted, participated in or directed, and had a meeting of the minds to take action that would and did deny plaintiffs meaningful access to the courts, and to retaliate against them for having exercised their 1st Amendment right to petition McGrew, an officer of the court, and for obtaining favorable relief from him within his jurisdiction under the order appointing him to allow them to do the court-ordered clean-up work at their house. Pursuant to this agreement and meeting of the minds, Defendants, by and through their agent and attorney Aljoe, coerced McGrew by threats to have him removed if he did not agree to unreasonably bar Leroy and his helper friend from entering the property in early Feb. 2013, and to execute an unreasonable and unlawful clean-up contract in mid-July 2013. McGrew unlawfully agreed to do so. McGrew's foregoing unreasonable and unlawful acts carried out the 1st Amendment retaliation of Wickboldt, G. Thomas, Does 1-10, and the City of Pleasanton, and resulted in denying plaintiffs meaningful access to the court.

137. The foregoing acts by Defendants were violations of plaintiffs' 1st Amendment rights of free speech and access to the courts for the following reasons: (a) Defendants' primary intent was to retaliate against plaintiffs for having exercised their right to petition McGrew, and for having obtained his permission to work to clean-up the property, and to prevent plaintiffs from having meaningful access to the court to oppose the clean-up contract. (b) But for Defendants' retaliation, and coercion of McGrew to execute the contract without prior approval of the court, and McGrew's agreement to do it, plaintiffs' would have had a meaningful opportunity to argue and for the court to find that plaintiffs should be permitted to finish the clean-up, or at least be allowed to remove Leroy's valuable personal property before the contract was executed. (c) Defendants retaliated against plaintiffs and coerced McGrew to bar

them from their house and property, and to execute the contract without the prior approval of the court under the express direction and orders of City abatement consultant/Special Counsel Aljoe for the corrupt purpose of gaining a corrupt advantage in a court of law.  (d) Defendants proper source for any proper relief was by petition to the court, not by retaliatory threats and coercion of McGrew to agree to their demands. (e) But for Defendants and their agent Aljoe's coercion of McGrew to bar them from working, and McGrew's agreement to do it, plaintiffs would have finished the clean-up themselves, the clean-up cost to the estate would have been nothing, the clean-up would have been finished much sooner than it was by the execution of the unlawful clean-up contract with DECON, and Leroy would not have lost the considerable value of his personal property. (f) Defendants' acts of retaliatory coercion of McGrew to deny plaintiffs meaningful access to the court, and McGrew's agreement to it, were intentional violations of Leroy's constitutional rights, and were malicious, in bad faith, and pursuant to Defendants' improper purpose of permanently and unlawfully depriving plaintiffs of their house and personal property by unreasonably detaining, seizing, and depriving it without due process of law. (g) This was the 14th act, of a series of unlawful acts pursuant to custom, policy and practice of the City of Pleasanton and City Attorney Lowell.

### CLAIM 21
**Unlawful Seizure of Title to Plaintiffs' House and Property Without Due Process of Law**
Plaintiffs v. Does 1-10, and City of Pleasanton

138. McGrew and Defendants Does 1-10, and the City of Pleasanton jointly and severally acted, participated in or directed, and agreed and had a meeting of the minds to effect McGrew's unlawful act of issuing and recording a deed of trust granting title of plaintiffs' property as security for a loan instead of a proper receiver's certificate. McGrew unlawfully recorded a Deed of Trust instead of a proper receiver's certificate on 5/28/2014 naming him as grantor of title to plaintiffs' house and property to lenders as security for a loan.  McGrew's acts were unlawful because he granted title and recorded the deed of trust without statutory or legal authority, without prior approval of the appointing court, and without authority under the order appointing him.

139.  McGrew's and Defendants' acts were unlawful in violation of plaintiffs' 4th and 14th Amendment rights for the following reasons: (a) McGrew unlawfully seized and granted title to plaintiffs' house and property and recorded the deed of trust instrument as security for a loan without statutory authority or competent procedural protections, without prior approval of the appointing court, and without authority under the order appointing McGrew. (b) No such authority can be lawfully granted, and the deed of trust is void because the title remains in the lawful possession of plaintiffs. (c) The issuing and recording of the deed of trust deliberately subverts and circumvents the judicial procedure on receiver's sales mandated by statute. (d) The issuing and recording the deed of trust is a deliberate circumvention of mandatory judicial procedure that will have the effect of depriving plaintiff Leroy of his statutory right to a Homestead Exemption. (e) The issuing and recording of the deed of trust significantly interferes with Plaintiffs' property interest without due process of law. (f) McGrew's and Defendants Does' 1-10 and the City's acts were deliberate violations of plaintiffs' constitutional rights, and were malicious, in bad faith, and pursuant to Defendants' improper purpose of permanently and unlawfully depriving plaintiffs of their house and personal property without due process of law. (g) This is the 15th act, of a series of unlawful acts pursuant to custom, policy and practice of the City of Pleasanton and City Attorney Lowell.

## CLAIM 22
**Acts 12-15 in furtherance of an Overall Unlawful Conspiracy to Unreasonably Seize and Deprive Plaintiffs of their House and Personal Property Without Due Process of Law**
Plaintiffs v. Defendants Aljoe, Lowell, Thomas, Wickboldt, Other Does 1-10, City of Pleasanton ("Defendants')

140.  Defendants Aljoe, Lowell, Thomas, Wickboldt, Other Does 1-10, and the City of Pleasanton jointly acted, participated in or directed, and agreed and had a meeting of the minds - pursuant to (a) communications and meetings between Aljoe, McGrew and others related to barring plaintiffs from working and vacating their property, (b) communications and meetings among Defendants concerning the unlawful execution of the DECON contract, (c) communications and meetings related to the unlawful issuance and recording of a deed of trust by McGrew – to  unlawfully seize and finally deprive Leroy of his valuable personal property

44

pursuant to an unlawful, unnecessary, and unreasonably costly clean-up contract, without due process of law; to retaliate against plaintiffs for their exercise of their free speech rights and right to meaningful access to the courts, and deny their right to meaningful access to the courts; and to unlawfully issue a deed of trust instead of a proper receiver's certificate as security for a loan against plaintiffs' property, and did so as the 12th - 15th acts in furtherance of Defendants' overall unlawful conspiracy to unlawfully deprive plaintiffs of their house and personal property without due process of law, and their further rights, privileges and immunities secured by the Constitution and laws of the United States, the State of California, and the City of Pleasanton.

## VI. STATEMENT OF FACTS AND CIRCUMSTANCES GIVING RISE TO CLAIMS 23-24

141. Plaintiffs incorporate herein by reference each and every allegation in the foregoing ¶¶ 1-140, and in the following ¶¶ 152-160, as though fully set forth herein.

142. On August 23, 2011 the City of Pleasanton and City Attorney Lowell entered into a "Professional Services Agreement" with defendant private attorney Aljoe. Aljoe, the City, and Lowell agreed that Aljoe would provide "Consultant Services" and that Aljoe as a "Consultant shall; assist the City Attorney's Office in Code enforcement and building code matters. Consultant shall provide legal advice as well as litigate matters as Special Counsel for the City."

143. An undated official City document titled "Abatement Action for Spitzer Property at 4719 Orangewood Court" states that "We recently hired attorney Trisha Aljoe to assist our office in abating this nuisance. Ms. Aljoe specializes in the abatement of properties with building code or municipal code violations. … After having Ms. Aljoe visit the property, we began discussing the best legal course of action to abate this particular property." This document mentioned changes in the municipal code suggested by Aljoe to allow recovery of "attorney fees for abating this type of property." At the top of the page is a handwritten note "more background for Nelson," signed "Julie." The Pleasanton City Manager's first name is Nelson. Julie Harryman is an Assistant City Attorney.

144. Defendant Aljoe has stated that she has "training in recognizing and abating" building code and State Housing Law violations. Aljoe has been reported to have stated that "whether receivership is the right option depends almost entirely on the value of the property and whether the receiver will be able to get a loan on the property."

145. At the time Aljoe gave Leroy verbal notice by telephone of the City's ex parte hearing to appoint a receiver she stated to him that "you have an expensive piece of Property." Plaintiff's are informed and believe, based on a recent appraisal that their house is currently valued at $650,000-700,000, as is. There is no outstanding mortgage.

146.  Plaintiffs are informed and believe, based on Aljoe's comments, that the value of their house was the reason for the defendants' decision to petition to appoint a receiver instead of using other less expensive, and more equitable alternatives, and to deny plaintiffs their right to enter their house and do the clean-up work. Defendants knew that sale of the house would be necessary to pay for unnecessary and exorbitant receivership expenses, including consultant and attorney fees payable to Aljoe. Sale of the house would also have the benefit to them of getting rid of Leroy. Allowing plaintiffs to work to correct the violations would prevent these outcomes.

147.  Leroy sent two letters to defendant Pleasanton City Attorney Lowell, one after the ex parte hearing, the other after the show cause hearing on appointment of a receiver, with copies of the first sent to the Pleasanton City Manager, and copies of the second letter sent to the City Manager and the Mayor of the City of Pleasanton. These letters contained Leroy's complaints about the conduct of defendants Aljoe, G. Thomas, Wickboldt, and police officer Does. Attached to the letters were evidence of the complained of misconduct.  Leroy did not receive a response to these letters, and no remedial action or discipline of Aljoe, Thomas, or Wickboldt was taken by either Lowell or the City.  Lowell and the City also had notice of defendants' conduct through sworn documents filed by plaintiffs.

148.  Leroy had previously made several visits to the City Manager's office to complain about the conduct of City building code enforcement officers. Remedial action was taken in Response to Leroy's first complaint. In a later visit, which occurred after Aljoe had been hired,

the City Manager's office staff refused to consult the City Manager regarding Leroy's desire to see him, or schedule a future appointment. They did so at the direction of the City Manager.

149.   After the show cause hearing, and the unlawful seizure of plaintiffs persons, the City Attorney's office issued a press release stating that it was the City's expectation that plaintiffs' house would be rented or sold by the receiver "in order to pay for the clean-up and rehabilitation work, and to cover any court imposed costs along with the receiver's fees."

150.   On Feb. 19, 2013, plaintiffs filed a detailed government claim pleading essentially the same facts stated herein up to that time. The government claim contained an Appendix A of Additional Facts, and an Appendix B of Documentary Evidence. A cover letter was attached to the Claim pleading that the City settle the case in such a manner as would allow the aged Leroy to keep possession of his home and the considerable investment it represented to him. The City did not respond to the Claim or its cover letter.

151.   The belatedly filed monthly report of the Receiver for April contains an email sent to a Citby agent that states that sale of the house to a 3rd party as-is "will most likely be the step directly following the clean-up."  The City unilaterally and extra-judicially vetoed the receiver's as-is sale proposal and decided that a sale would not occur until the house was repaired. A repair contract was subsequently submitted for approval by the receiver for the amount of $190,000 that contained unreasonable, unnecessary, and high-end and expensive options, such as $18,000 for landscaping, $11,000 for replacing windows, and $45,000 for remodel of the kitchen.  The cost of repairs was originally estimated by defendant G. Thomas to be $50,000 which was the true and correct amount, and a cost that plaintiffs could have paid.

**CLAIM 23**
**§ 1983 *Monell* Liability for Foregoing Claims 1-22**
Plaintiffs v. Defendant final policy-maker City Attorney Lowell, City of Pleasanton ("Defendants").

152. The acts of overall conspiracy alleged in Claims 3, 6, 8, 13, 17, and 22 above, and incorporated herein by reference, were the result of the defendant City's and City Attorney's policy of maliciously and intentionally applying the California State Housing Law in an unconstitutional manner. This policy is to improperly and unlawfully seize high value

1   residential property subject to abatement in order to convert it into unreasonable and
2   unnecessary, and costly receiver's and attorney's fees to profit from, and pay the costs of a
3   receivership action. Defendants' policy is implemented by maliciously and intentionally
4   choosing unnecessary receivership actions for which there are more reasonable and equitable
5   alternatives, and depriving owner/residents of a reasonable opportunity to correct the violations
6   or vacate their personal property by unreasonably barring them from entering their house. The
7   policy is completed by forcing sale of the real property to pay the unnecessary, and oppressively
8   high costs of receivership, attorney fees, and costs, and dispossessing its resident-owner by its
9   sale without the due process of law.

10      153. The conduct and acts of the individual defendants were further the result of a
11   policy, custom, or practice of defendant City of Pleasanton, and defendant City Attorney of
12   tolerating, approving, and ratifying known constitutional violations; failing to take disciplinary
13   action to rectify and prevent known abuses; and deliberate indifference to the repeated
14   commission of known constitutional violations.

15      154. The City of Pleasanton is liable under § 1983 and *Monell*, for the following
16   reasons; (a) In matters that concern the abatement of public nuisances, the city attorney is a final
17   policy-maker for the City of Pleasanton. (b) Plaintiffs' letters of complaint to the City,
18   plaintiffs' government claim, and the multiple constitutional violations set forth in Claims 1-21
19   are evidence of policies, customs, or practice of tolerating, approving, and ratifying known
20   constitutional violations; failing to take disciplinary action to rectify and prevent known abuses;
21   and deliberate indifference to the repeated commission of known constitutional violations. (c)
22   Aljoe is a private attorney serving the City through a "Professional Services Agreement" over
23   which and over whom defendant City Attorney Lowell has multiple legally mandated duties of
24   oversight.  Lowell as City Attorney has the legal duty to make "critical discretionary decisions"
25   concerning any abatement actions, not private attorney Aljoe; and he has the ethical duty of
26   oversight of a subordinate attorney under the laws governing lawyers. Accordingly he knew or
27   reasonably should have known of her misconduct, and approved of and ratified it. (d) The
28   conduct and acts of both Lowell and Aljoe are imputed to the City by the attorney-client

relationship. (e) Both the City and Lowell entered into an agreement with Aljoe to initiate a receivership action against plaintiffs, not in spite of, but because of the high value of plaintiffs' house which would pay for unnecessary and exorbitant costs of receivership by its sale, which was the rationale for barring plaintiffs from entering their house and working to abate the violations. (f) The receivership action was deliberately chosen by the City and Lowell from less oppressive, and more efficient available alternatives. (g) Both the City and Lowell set in motion a series of acts by others by hiring Aljoe, which they knew or reasonably should have known would lead to the constitutional violations that occurred. (h) Both the City and Lowell knowingly refused to terminate a series of unconstitutional acts by defendants in spite of repeated and detailed notice of these repeated violations.

## CLAIM 24
### § 1983 Supervisor liability for foregoing Claims 1-22
Plaintiffs v. Defendant City Attorney Lowell ("Defendant")

155. Plaintiffs incorporate herein by reference ¶¶ 152-153 as though fully set forth herein.

156. Defendant City Attorney Lowell is the supervisor of defendant private attorney abatement consultant/special counsel Aljoe. Lowell is liable as a supervisor under § 1983 for the actions of Aljoe for the following reasons: (a) In matters that concern the abatement of public nuisances, City attorney Lowell is a final policy-maker. (b) The execution of Lowell's policies, customs, or practices resulted in the constitutional violations set forth in Claims 1-21. (c) Aljoe is a private attorney serving the City through a "Professional Services Agreement" over which and over whom defendant City Attorney Lowell has multiple legally mandated duties of oversight. Under California law, Lowell as City Attorney has the legal duty to make "critical discretionary decisions" concerning any abatement actions, not private attorney Aljoe; and he has the ethical duty of oversight of a subordinate attorney under the laws governing lawyers. Accordingly Lowell knew or should have known of her constitutional violations. (d) Lowell entered into an agreement with Aljoe to initiate a receivership action against plaintiffs, not in spite of, but because of the high value of plaintiffs' house which would pay for

unnecessary and exorbitant costs of receivership by its sale, which was the rationale for barring plaintiffs from entering their house and from working to abate the violations. (e) The receivership action was deliberately chosen by Lowell from less oppressive, and more efficient available alternatives. (d) Lowell set in motion a series of acts by others by hiring Aljoe, which he knew or reasonably should have known would lead to the constitutional violations that occurred. (f) Lowell knowingly refused to terminate a series of unconstitutional acts by defendants in spite of repeated and detailed notice of these repeated violations.

## DEMAND FOR JUDGMENT AND THE FOLLOWING RELIEF

157. As a direct and proximate cause of the defendants' conduct, and each of them, plaintiffs have suffered and will continue to suffer for the loss of personal autonomy, dignity, and self-worth; the loss of vital rights to be secure in their house and personal possessions; humiliation; mental anguish and emotional distress, and from the effects of the defendants' interference with their property rights which has caused them injury from delay of their remediation, repair, and use of their house, and increased the personal and actual costs of remediation and repair of their house.

158. Plaintiff Leroy cared for his wife at the house during her terminal illness, and she died there in her house, and in the company of her family. This is a factor that has increased Leroy's loss in regard to mental anguish and emotional distress.

159. Plaintiffs Leroy has suffered special damages in the amount of $250,000 for loss of, and loss of use of his personal property.

160. At all times mentioned herein individual defendants have acted with malice, oppression, fraud, bad faith, and improper motive; and with deliberate indifference to the constitutional, state statutory, and municipal rights of the Spitzers. The individual defendants' acts, taken together, are an egregious violation of normal standards of law, reason, and justice that amounts to felonious conduct, some of which occurred in a courtroom, that reflects very badly on our system of law and justice. Punitive damages should be awarded for the sake of example of conduct that will not be permitted, and by way of punishing the defendants.

1

2

**Wherefore,** plaintiffs demand judgment against defendants, and each of them, for the following:

3

1. General damages in an amount of $700,000;

4

5

6

7

2. Special damages for the permanent loss of Leroy's personal property, and the loss of use of Leroy's personal property stored in the house during the time he was barred from entering his house, in the amount of $250,000; and for his loss of the use of his house, in the amount of $120,000.

8

3. Punitive damages against individual defendants in the amount of $1,000,000

9

4. Costs of suit incurred herein;

10

5. Attorney fees incurred;

11

6. Prejudgment interest;

12

13

7. Such additional equitable and further relief that may be determined by the court to be just and proper.

14

15

Dated: Apr. 13, 2015            By: ...........*Deron A. Kartoon*...........
                                          Deron A. Kartoon

16
                                          Law Offices of Deron A. Kartoon
                                          3 Sir Francis Drake Boulevard

17
                                          P.O. Box 1403
                                          Ross, CA 94957

18
                                          Telephone: (415) 786-7737
                                          Fax: (415) 755-4672

19
                                          Email: deron.kartoon@gmail.com

20
                                          Attorneys for Plaintiffs

21

22

**DEMAND FOR JURY TRIAL**

23

24

Plaintiffs hereby demand a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

25

26

Date: Apr. 13, 2015            By: ............*Deron A. Kartoon*.............
                                          Deron A. Kartoon

27
                                          Attorney for Plaintiffs

28

THIRD AMENDED COMPLAINT                              CV 13-5442 MEJ